Carmen N. **RIVERA**

v.

**Shirley S. CHATER, Commissioner, Social Security Administration.**

**Civil Action No. 95–10814–GAO.**

United States District Court, D. Massachusetts.

Sept. 18, 1996.

H. Crowell Freeman, Boston, MA, for Carmen N. Rivera.

Sara Miron Bloom, United States Attorney's Office, Boston, MA, for Secretary of Health and Human Services.

## MEMORANDUM AND ORDER

O'TOOLE, District Judge.

The plaintiff Carmen N. Rivera appeals from a final decision of the Commissioner of the Social Security Administration to deny her disability benefits. Finding that the administrative record substantially supports the Commissioner's decision, the Court now affirms that decision.

## I. FACTS

Rivera is a thirty-two year old woman with an eighth grade education who had worked for a number of years as a nurse's aide. She alleges disability resulting from a left shoulder and neck injury suffered on August 10, 1990, while she was attempting to lift a patient in a nursing home.

Rivera's medical history indicates that she sought treatment on the day after her injury at the Massachusetts General Hospital. (R. at 152.) She was diagnosed as having suffered back strain and was advised to refrain from working until August 16, 1990, and from lifting more than 15 pounds through August 20. On a return visit, she was again diagnosed with muscle strain and advised to remain at home until August 24, 1990. (R. at 336–37.)

Rivera was then referred to Dr. Matthew Gold, who performed a neurological evaluation on August 29, 1990. (R. at 162–164.) His diagnosis was that Rivera had acute winging of the left scapula, indicating either a long thoracic traumatic stretch neuropathy with some associated neck sprain and compressions or brachial plexus stretch injury. He recommended an MRI and physical therapy, and prescribed conservative treatment with Feldene and Doxepin. (R. at 163–64.)

Rivera began physical therapy at Whidden Memorial Hospital on September 11, 1990, where her rehabilitation potential was described as fair to good. (R. at 153.) She continued this therapy through September 21, 1990, but cancelled therapy five days later because of excessive pain. (R. at 155.) On September 14, 1990, Rivera underwent an electromyogram which revealed a mild left C7 radiculopathy. (R. at 158–160.) On September 20, 1990, an MRI of Rivera's cervical spine found minimal annulus bulging without evidence of disc herniation at C3–C4 and C4–C5. (R. at 161.)

Rivera saw Dr. Gold again on October 10, 1990. He characterized Rivera's condition as a probable left brachial plexus stretch injury that prevented her from lifting more than five to seven pounds above her left shoulder. He anticipated several "months of continued weakness before it is clear whether or not this will improve." (R. at 165.)

Later that month, Rivera resumed physical therapy at Whidden Hospital, where her rehabilitation prospects were again assessed to

be fair to good. (R. at 156.) Upon examining Rivera on November 6, 1990, Dr. Gold noted that she appeared well and had no sensory abnormality or reproducible weaknesses aside from the winging of the left scapula. (R. at 166.) He reasserted his previous diagnosis of a probable left brachial plexus stretch injury affecting the long thoracic nerve with myofascial pain. He also referred Rivera to a new therapy center. (R. at 166–67.) On November 13, 1990, Rivera was evaluated for physical therapy at the New England Rehabilitation Center. (R. at 198.) Rivera began therapy there in January 1991, and progressed well through July 1991. (R. at 199–201, 206–32.)

Rivera saw Dr. Gold again in February and May 1991. Her condition and diagnosis remained essentially unchanged, although he remarked that the strength in her left arm was slowly improving. (R. at 169–73.) At the May 1991 visit, Dr. Gold further noted that Rivera had achieved some success in decreasing her shoulder pain, despite continuing soreness in the area of the left scapula. (R. at 172.)

In July 1991, Rivera's physical therapist, Theresa O'Neil, reported that Rivera had made significant progress with respect to her shoulder condition but that she would need the support of a corset if she were to return to her previous job as a nurse's aide. She further noted that, barring a return to her previous job, Rivera "might benefit from the services of a vocational counselor." (R. at 232.) O'Neil recommended that Rivera continue her physical therapy to ameliorate her pain.

Rivera next saw Dr. Allan H. Ropper, Chief of Neurology at St. Elizabeth's Hospital. Dr. Ropper stated that the only definite finding on the physical exam was a marked winging of the left scapula, with possible left deltoid weakness. (R. at 243–44.) Dr. Ropper opined that Rivera had a high left brachial plexus traction injury with possible chronic dysfunction of the left shoulder. (R. at 243.)

He suggested repeating an MRI and EMG and referred her to another neurologist for consultation. (R. at 243–44).

The MRI, conducted in November 1991, was essentially normal. (R. at 245.) A nerve conduction study and EMG showed no definite evidence of any lesion in the left brachial plexus. (R. at 249.) Dr. Hayes recommended that Rivera use a back brace to decrease scapula region pain and use a combination of medications to treat the ongoing pain. (R. at 251.)

In January 1992, Dr. Gold reported that Rivera found the use of a TENs unit considerably relieved her pain. On examination, he noted a profound winging of the left scapula with soreness in the rhomboid area. He remarked that Rivera's condition was a long thoracic/brachial plexus stretch injury. Dr. Gold opined that Rivera's condition was probably a permanent injury which would limit full use of her left arm and impair her ability to return to full time nursing. He nonetheless suggested that Rivera could return to activities similar to her past work, such as dispensing medication or acting in a supervisory capacity. (R. at 178.)

Rivera applied for disability insurance benefits on September 9, 1992. It is not disputed that Rivera met the insured status requirements for Title II disability benefits on August 11, 1990, and continued to meet them through March 31, 1991. In order to be eligible for disability benefits, she must establish that she was disabled within the meaning of the governing statute and regulations on or before March 31, 1991.

The Social Security Administration denied Rivera's application both initially and on reconsideration. An Administrative Law Judge ("ALJ") then considered the case *de novo*. After a hearing, the ALJ concluded that Rivera did not suffer a qualifying disability as of March 31, 1991, and thus was not entitled to disability benefits.[1] The Appeals Council denied Rivera's request for review, thus making the ALJ's decision the final

1. The ALJ did find Rivera to be eligible for Supplemental Security Income benefits ("SSI") as of February 1993. Although she objected to the Appeals Council that the ALJ had erred in concluding that February 1993 was the time of onset of her disability for the purposes of eligibility for SSI, Rivera does not press that objection in the present appeal directed to her application for disability insurance benefits.

decision of the Commissioner, subject to judicial review.

## II. DISCUSSION

■ A claimant aggrieved by a final decision of the Commissioner to deny her benefits may seek review of the decision in the United States District Court in the district where she resides. 42 U.S.C. § 405(g). The Court's review of the administrative decision is based upon the pleadings and transcript of the administrative record. "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." *Id.*

A disability, as defined by the statute, means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A person is considered to be under a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A).

In evaluating a claim under 42 U.S.C. § 423(d) to determine benefits eligibility, the Commissioner essentially asks five sequential questions. First, is the individual currently employed? Second, does she have a "severe impairment"? Third, does she have an impairment equivalent to the list of specific impairments contained in 20 C.F.R. pt. 404, subpt. P, app. 1? Fourth, does the impairment prevent her from performing work of the kind she has done in the past? Fifth, does the claimant's disability prevent her from performing other work of the sort found in the economy? *Goodermote v. Secretary of Health & Human Servs.,* 690 F.2d 5, 6–7 (1st Cir.1982).

The first three inquiries constitute a threshold test. An affirmative answer to the first or a negative answer to the second renders the individual automatically ineligible for benefits, while an affirmative answer to the third means that the individual is automatically eligible for benefits. The threshold questions are not seriously disputed in this case. As to the first two, the Commissioner admits that Rivera is currently unemployed and has a severe impairment. (R. at 19–21.) As to the third, Rivera does not argue that her alleged impairment corresponds to any listed in Appendix 1.

When eligibility has not been decided at the threshold, the inquiry moves on to the last two questions. Answering these questions requires a determination of the claimant's "residual functional capacity," that is, what a claimant can still do despite her physical or mental impairments. The regulations and applicable case law call for consideration of all relevant medical and non-medical evidence, including medical records, observations by examining physicians, evaluations of the medical evidence by non-examining physicians, and the testimony of the claimant and others who have observed her. 20 C.F.R. §§ 404.1529, 404.1545 (1995); *see also Avery v. Secretary of Health and Human Servs.,* 797 F.2d 19 (1st Cir.1986).

■ The fifth question, the claimant's ability to perform work other than what she had done in the past, is analyzed from two different perspectives. First, applicable regulations contain a set of Medical–Vocational Guidelines, commonly referred to as the "Grid," to provide a general rule of decision by cross-referencing a claimant's various qualifications and limitations. *See* 20 C.F.R. pt. 404, subpt. P, app. 2 (1995). The second inquiry involves a more individualized review of work the claimant could potentially do if she has limitations not fully reflected within the Grid framework. The Commissioner bears the burden of showing that there are other jobs in the economy that the claimant can perform in spite of her disability. *Goodermote,* 690 F.2d at 7.

■ In this case, the ALJ determined that Rivera could not perform her past relevant

work as a nurse's aide, but that there were a significant number of other jobs in the local economy that she could perform. Rivera challenges that determination on several grounds. She contends that the ALJ ignored medical evidence which suggested that she was totally disabled as of March 31, 1991. She also argues that there was no basis for finding that Rivera's subjective allegations of pain were not credible, and that her condition enabled her to perform either light or sedentary work. Although it might have been possible on the evidence for the ALJ to have resolved the issues favorably to Rivera, the record contains substantial support for his conclusion that Rivera possessed the residual functional capacity to perform light work and that her non-exertional impairments did not prevent her from performing several other jobs that exist in significant numbers in the economy.

The doctors who examined Rivera never indicated that she was incapable of performing any gainful employment activity. To the contrary, Rivera was encouraged on various occasions to pursue physical therapy, work hardening programs, and vocational planning. The only activity restriction imposed by any of her treating physicians was to avoid lifting more than five to seven pounds above her left shoulder. (R. at 165.) The ALJ particularly noted the absence of physician-imposed functional limitations on Rivera's ability to sit, stand, or walk. The medical evidence lends support to the ALJ's conclusion that, as of March 31, 1991, Rivera was capable of performing light work.[2]

The ALJ also considered Rivera's subjective claims of pain under the criteria outlined in *Avery v. Secretary of Health and Human Servs.*, 797 F.2d at 19. (R. at 21.) He concluded that the claims were out of proportion to the objective medical evidence insofar as they attempted to establish a disabling level of pain that prevented her from performing light or sedentary work. (R. at 21–22.) The ALJ was correct that the medical

records do not suggest that Rivera's condition barred her from performing any gainful substantial activity. It is clear that she was suffering some pain and that the pain contributed to her being disabled from performing some kinds of work, including her prior work as a nurse's aide. The ALJ recognized all of that. But the medical records also disclose that the people treating her thought there was other work she could do. *See* Dr. Gold's notes of January 22, 1992, and July 22, 1992 (R. at 178–79) and the physical therapist's assessment of July 18, 1991. (R. at 231–32.) Whatever different conclusions a fact finder could plausibly have reached about Rivera's claims of pain, this Court may not substitute them for those of the ALJ so long as the ALJ's findings are supported by substantial evidence. *Rodriguez Pagan v. Secretary of Health and Human Servs.*, 819 F.2d 1, 3 (1st Cir.1987) (*per curiam*), *cert. denied*, 484 U.S. 1012, 108 S.Ct. 713, 98 L.Ed.2d 663 (1988).

Substantial evidence similarly supports the ALJ's conclusion that there existed a significant number of jobs in the national economy which Rivera could perform given her functional limitations. Along with the residual functional capacity and functional assessments of Rivera's treating physicians, the ALJ relied on evidence given by a vocational expert, who testified that a person with Rivera's limitations could perform numerous jobs in the local economy. (R. at 80–84.)

In sum, this Court may not substitute its judgment for that of the ALJ in resolving conflicts in the evidence as long as substantial evidence supports the ALJ's conclusion. *See Lizotte v. Secretary of Health & Human Servs.*, 654 F.2d 127, 128 (1st Cir.1981). Because the ALJ's decision is supported by substantial evidence, this Court is bound to affirm it "even if the record arguably could justify a different conclusion." *Rodriguez Pagan*, 819 F.2d at 3.

---

**2.** Rivera contends that the ALJ erroneously concluded that she could return to light or sedentary work, because he ignored Dr. Gold's assessment that Rivera was "disabled." (R. at 166–70.) The ALJ addressed that assessment and concluded that, in context, Dr. Gold was likely referring

only to Rivera's ability to perform her past work *as a nurse's aide,* and not to her ability to perform *any* gainful substantial activity. A review of Dr. Gold's office notes indicates that that was a reasonable interpretation of Dr. Gold's views. (R. at 178–79.)

For the foregoing reasons, the Commissioner's decision to deny Rivera disability benefits is AFFIRMED.